## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **VALERIE R. FAUGHT,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  6:23-cv-01753-RDP** |
| | } | |
| **MARTIN O'MALLEY,** | } | |
| **COMMISSIONER, SOCIAL SECURITY** | } | |
| **ADMINISTRATION,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OF DECISION</u>

Plaintiff Valerie R. Faught filed this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") that denied her claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI"). *See also* 42 U.S.C. §§ 405(g) and 1383(c). Based on the court's review of the record and the briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## I.    Proceedings Below

Plaintiff filed her application for a period of disability and DIB on May 3, 2021 (Tr. 87) and filed her application for SSI on May 24, 2022.[1] (Tr. 225). In the applications, she alleged a disability onset date of May 3, 2019. (Tr. 220). The applications were denied initially on November 9, 2021, and on reconsideration on November 30, 2022. (Tr. 17, 117, 123). After a telephone hearing held on May 4, 2023 (Tr. 40-69, 185), Administrative Law Judge Clarence Guthrie

---

[1] The ALJ notes that Plaintiff protectively filed her application for SSI on May 18, 2022. (Tr. 17, 34).

("ALJ") issued a decision on May 22, 2023, finding Plaintiff was not disabled. (Tr. 14-39). On October 31, 2023, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. 1). That decision became the final determination of the Commissioner, and therefore a proper subject of this court's appellate review.

At the time of the May 2023 hearing, Plaintiff was forty-one years old, who made it into the eighth grade but did not finish. (Tr. 45, 48, 60). Plaintiff has previous work experience as a private sitter and trucking dispatcher. (Tr. 48-49). Plaintiff had previously reported that she also worked as a package handler, sales stocker, and in telecom marketing. (Tr. 270). Plaintiff alleges that she suffers from herniated discs, degenerative disc disease, lumbar spondylosis, scoliosis, fibromyalgia, paresthesia, bilateral carpal tunnel syndrome, and post-viral syndrome. (Tr. 88). During the hearing, the ALJ also noted that Plaintiff was obese and had records of depression, anxiety, high blood pressure, gastroesophageal reflux disease, and irritable bowel syndrome. (Tr. 49). According to Plaintiff's hearing testimony, she has been unable to work since May 3, 2019. (Tr. 48). Plaintiff's SSA-3367 Disability Report Form indicated that she stopped working on December 24, 2020. (Tr. 297).

Plaintiff complained of anxiety that she says keeps her confined to the house except when she has medical appointments. (Tr. 50-51). Plaintiff testified that she must "prep" herself to go to medical appointments because she panics when she walks into a lobby full of people who she feels are staring at her. (*Id.*). Additionally, Plaintiff reported daily panic attacks that last fifteen to thirty minutes at a time and stated that she takes Xanax to help with them. (Tr. 53). Plaintiff also testified as to her panic attacks that even when she is taking Adderall, she cannot concentrate on watching television for more than ten minutes before zoning out. (Tr. 56).

Additionally, Plaintiff stated that she suffers from fibromyalgia that worsens in extreme cold or heat and causes pain in her stomach, ribcage, chest, arms, and legs. (Tr. 51). She underwent spinal stimulation on January 13, 2023 to help with her chronic back pain. (Tr. 52, 1163). Plaintiff takes Flexeril, Gabapentin, and a muscle relaxer for the pain. (Tr. 52-53). She rates her paid as ten out of ten. (*Id*.). The medications she takes cause her to have slower reflexes and to be less alert. (Tr. 53).

Plaintiff also complained that she only sleeps two to four hours per night, and has issues concentrating due to attention deficit disorder ("ADD"). (Tr. 55-56). Plaintiff testified that her disabilities have worsened since May 2019, even though she has seen a chiropractor and gone to physical therapy. (Tr. 59-60).

At the hearing, Plaintiff asserted that although she can drive, she does not often do so and usually cannot bathe herself without assistance. (Tr. 57-58). Plaintiff stated that she can cook a simple meal (such as a sandwich or Hamburger Helper), feed herself, go to the store, eat out, fold three or four towels at a time, brush her teeth, and keep her three-bedroom house clean with the assistance of her son and husband. (Tr. 57-59). She also admitted that "[s]ome days [she] can" dress herself without assistance, although "[m]ost days [she] can't." (Tr. 57). According to Plaintiff, she can only lift two to three pounds without experiencing pain in her back, shoulders, and arms. (Tr. 54). Plaintiff stated that she cannot sit in a straight-backed chair for more than ten minutes, cannot stand for more than ten to fifteen minutes, and cannot walk more than a half of a football field before she needs to rest. (*Id*.). Because of this, she lays down for at least four to five hours during normal work hours. (Tr. 55). Plaintiff further described how her symptoms leave her essentially bedridden about five days out of the week. (Tr. 57). Plaintiff said she wears a Fitbit to monitor her steps and on days that she is not in bed, normally gets around 3,000-4,000 steps per

day. (Tr. 61). In her function report, Plaintiff stated that she usually has no problem paying attention, following written or spoken instructions, and getting along with authority figures. (Tr. 286).

One of Plaintiff's medical issues is pain in her back and joints, as well as fibromyalgia-related pain. Primary care provider notes from May 2018 through August 2019 describe Plaintiff's complaints of left side flank pain. (Tr. 726-27, 720). Primary and urgent care provider notes from January and February 2020 similarly describe Plaintiff's complaints of left side flank pain that runs up and down her back (Tr. 714) and right-side pain that worsens when sitting and that does not improve with medication. (Tr. 712, 463).

In March 2020, Plaintiff reported to Winfield Neurology with pain in her right lower back and right side. (Tr. 460). The doctor assessed her as lumbago with right side sciatica and prescribed Nabumetone, Neurontin, and back strengthening exercises. (Tr. 461). The next day, an MRI of Plaintiff's lumbar spine indicated idiopathic scoliosis and disc bulge at T11-T12 and T12-L1. (Tr. 377, 523). In April 2020, Plaintiff reported to an urgent care facility complaining of a dull aching right side flank pain. (Tr. 458, 526). The nurse practitioner recommended a colonoscopy and a CT. (Tr. 459, 527). Notes indicate Plaintiff had a normal gait. (Tr. 459, 526-27). Two days later, a CT of Plaintiff's Abdomen and Pelvis showed degenerative disc disease at T11-T12 in the lower thoracic spine. (Tr. 375, 528).

In June and July 2020, Plaintiff reported to urgent care and her primary care provider that she had increased pain in her lower back and on her lower right side (Tr. 456-57, 373-74), and a decreased range of motion in her lumbar spine. (Tr. 373-74). Notes indicated she had a normal gait (Tr. 456-57). She was prescribed Meloxicam and referred to Southern Orthopedics. (Tr. 457). On July 23, 2020, Plaintiff reported to Southern Orthopedics, describing how her lower back pain had

4

progressively worsened over the past four months. (Tr. 373). The provider prescribed lumbar epidurals and noted that Plaintiff had 5/5 motor strength for hips and knees, as well as intact sensation. (Tr. 373-74). Plaintiff had the lumbar epidurals performed and saw her primary care provider in October 2020, describing how the epidurals only offered limited relief and how her back pain had later come back "with vengeance." (Tr. 371).

An MRI of Plaintiff's lumbar spine from October 2020 showed multilevel degenerative changes but no significant nerve compression. (Tr. 367). Plaintiff presented to Dr. Paola Tumminello at Walker Neurology on October 27, 2020 complaining of chronic fatigue and back pain. (Tr. 389). Notes from that day indicate Plaintiff had normal gait, 5/5 upper extremity and lower extremity motor abilities. (Tr. 391). In December 2020, Plaintiff reported to her primary care provider that she had low back pain, and that she had stopped seeing pain management. (Tr. 694). In January 2021, Plaintiff told Dr. Tumminello that although Elavil helped her pain, her pain became severe again when she ran out of her prescription medication. (Tr. 410). Notes from that visit also indicate Plaintiff had normal gait, 5/5 upper extremity and lower extremity motor abilities, and had intact sensation and coordination. (Tr. 412-13). In February 2021, Plaintiff reported myalgias to her primary care provider. (Tr. 688). In a visit later that month, Plaintiff told Dr. Tumminello that her pain was "still severe." (Tr. 423). Provider notes from February, May, July, and September 2021 also recorded observations of Plaintiff's motor systems, noting that Plaintiff had a normal gait (Tr. 426, 454, 561, 625, 639), 5/5 motor strength in all extremities (Tr. 425, 561, 625, 639), and intact sensation and coordination. (Tr. 425-26, 625, 639).

In October 2021, Plaintiff complained of back pain to her primary care provider. (Tr. 314). The provider observed a reduced range of motion of the lumbar spine, increased pain with hyperextension, some relief with slight forward flexion, and decreased sensation in an S1

distribution. (Tr. 314-35). The provider diagnosed Plaintiff with degeneration of lumbar intervertebral disc, an above normal high body mass index, spondylosis, lumbar stenosis with neurogenic claudication, and other idiopathic scoliosis. (Tr. 315-16). He recommended an MRI scan, as well as diet and exercise. (Tr. 316). The MRI scan was performed a few days later and indicated degenerative disc disease at T11-T12 and T12-L1, as well as facet arthropathy and ligamentum flavum hypertrophy at L1-L2, L2-L3, and L3-L4, L4-L5, and L5-S1. (Tr. 318-19). There was also broad-based disc bulge at T11-T12, T12-L1, and L4-L5 and shallow disc bulge at L5-S1. (*Id*.). The impression was similar in appearance to a previous exam a year before. (*Id.*). The provider recommended physical therapy. (Tr. 323). Plaintiff attended thirteen physical therapy sessions in November and December 2021. (Tr. 750, 308). The physical therapist noted that Plaintiff's pain was from her shoulders to her tail bone and ranged from a four to an eight out of ten in intensity. (Tr. 308). He further noted that Plaintiff had a severely limited range of motion for lumbar extension, that her hip pain upon standing had increased, and that there was no significant gait deviation. (Tr. 309).

On October 16, 2021, Plaintiff reported for a Social Security Disability Consultative Examination, and she was assessed as having herniated disc/DDD/lumbar spondylosis/scoliosis, fibromyalgia/paresthesia/BL carpal tunnel syndrome, and post viral syndrome. (Tr. 653). Plaintiff also had pain in eleven out of eighteen tender points on digital palpation. (Tr. 654). Notes indicate Plaintiff had 5/5 grip strength and upper extremity strength, 5/5 left lower extremity strength, and 4/5 right lower extremity strength. (Tr. 650). She had no difficulty getting on and off the examination table, walking on her heels, walking on her toes, squatting and rising, and putting her finger to her nose. (Tr. 651). Her gait was steady without use of an assistive device. (*Id*.).

On January 24, 2022, Plaintiff reported to her primary care provider that her physical therapy was not helping, that she was unable to work, and that she had back pain and groin pain. (Tr. 324, 969, 1040). The provider noted that "her pain seems to be getting progressively worse" and recommended three lumbar epidural steroid injections. (Tr. 326, 971, 1042). On March 31, 2022, Plaintiff reported to her primary care provider complaining of painful muscle spasms in her neck and back. (Tr. 951). Her provider prescribed Cyclobenzaprine. (Tr. 952). Plaintiff received three lumbar epidural steroid injections in April and May 2022. (Tr. 996-98). In June 2022, Plaintiff reported to her primary care provider that the steroid injections made "all her pain worse." (Tr. 976, 1035). The provider recommended an MRI and an EMG nerve conduction study. (*Id*.). Notes from Plaintiff's visits to psych services during this time (January through July) indicated that Plaintiff had normal gait during her visits. (Tr. 817, 821, 823).

On July 7, 2022, Plaintiff underwent an NS Muscle Test with Nerve Complete to examine her left hip pain, and the outpatient diagnosis was lumbar stenosis with neurogenic claudication, degeneration of lumbar intervertebral disc, spondylosis, and other idiopathic scoliosis. (Tr. 1011). On July 18, 2022, Plaintiff reported to her primary care provider that her fibromyalgia was flaring up and Flexeril was not helping. (Tr. 943). Plaintiff stopped taking Cyclobenzaprine and started taking Xanaflex. (Tr. 944). Notes from psych services indicate that Plaintiff reported pain due to fibromyalgia in March and July 2022. (Tr. 817, 824).

On September 6, 2022, MRIs were performed of Plaintiff's left and right hip. (Tr. 1012, 1018). The scans showed mild degenerative joint disease of the left hip and moderate degenerative joint disease of the right hip. (Tr. 1015-16, 1018-19, 1045-48). A lumbar spine MRI performed on the same date showed long segment left convex curvature spondylosis greatest at the apex of the curve at T11-12 and T12-L1 with moderate right foraminal narrowing at T12-L1 and mild to

moderate right foraminal narrowing at T11-12, and otherwise mild lumbar spondylosis from L1-5. (Tr. 1012-13, 1043-44). On September 14, 2022, Plaintiff reported to her primary care provider for a follow-up of her MRI scans. (Tr. 992, 1030). The provider noted that he thought Plaintiff's groin pain was coming from right hip degenerative changes and arthritis and that her low back pain was coming from L4-5. (*Id*.). He discussed treatment options, including a right hip injection and a fusion at L4-5 for spondylolisthesis. (Tr. 992, 1030). Plaintiff was referred for a right hip injection. (Tr. 992, 1032). On September 20, 2022, Plaintiff saw Dr. Tumminello for a follow-up of her conditions and reported worsening pain in her right hip. (Tr. 1022). Notes show the most recent EMG/NCS in 2022 produced normal results. (*Id*.). Examination notes also show Plaintiff had normal gait, 5/5 upper extremity and lower extremity motor abilities, was awake, alert, and oriented, and had intact concentration, sensation, and coordination. (Tr. 1024).

On October 10, 2022, Plaintiff reported to Andrews Sports Medicine and Orthopaedic Center complaining of bilateral hip pain. (Tr. 1059). She described it as severe, sharp, stabbing, and burning, and stated that it worsened with most activities. (*Id*.). She was diagnosed with bilateral hip osteoarthritis and left partial proximal hamstring tear. (Tr. 1060). The provider ordered a steroid injection and referred her to physical therapy. (*Id.*). Later in October and November, Plaintiff attended three physical therapy sessions. (Tr. 1112, 1109, 1106). The therapist noted that after the initial visit, Plaintiff reported only mild left and right hip pain. (Tr. 1106, 1109). On October 18, 2022, Plaintiff reported to Dr. Bryan S. Givhan complaining of cervical, thoracic, left shoulder pain, and severe knee pain on the right side. (Tr. 1068). Dr. Givhan reviewed an MRI and diagnosed her with degenerative spine changes at multiple levels. (Tr. 1068-69). He recommended against surgery for decompression and fusion at L4-5 and referred her to an orthopedist for right knee pain. (Tr. 1069).

Primary care follow-up notes from September through December 2022 reveal some complaints of myalgias. (Tr. 1134, 1138). Examinations in these records show few abnormalities except for the visit on October 11, 2022. (Tr. 1134). During this visit, she reported increased joint pain and more pain in her hands. (*Id*.).

Orthopedic notes from October 28, 2022 indicate Plaintiff presented with complaints of right knee pain, which had worsened since a jogging-related injury in July 2018. (Tr. 1083). X-rays showed minimal joint space narrowing medially and minimal osteophyte formation medially and on the patella. (Tr. 1084). Examination notes show no swelling or deformity of the right knee, but mild tenderness over the patellar retinaculum and at the inferior pole of the patella. (*Id*.). There was full range of motion and strength was normal at 5/5. (*Id*.). Her gait favored the affected side. (*Id*.). The impression was mild osteoarthritis of the right knee. (*Id*.). She was provided with a lidocaine and Kenalog injection. (*Id*.).

Neurosurgery notes on November 10, 2022 indicate Plaintiff complained of back, hip, and buttock pain with radicular symptoms that were unimproved with treatment. (Tr. 1124). The provider noted that imaging records showed slight degenerative spondylolisthesis at L4-5, which he described as minimal and without severe stenosis. (*Id*.). He concluded that surgery would be "a fairly aggressive undertaking considering her MRI findings" and suggested a dorsal column spine stimulator as a less invasive procedure. (*Id*.). Plaintiff underwent spinal stimulation on January 13, 2023. (Tr. 1163). Examination notes from January 2023 specify that she did not experience significant pain relief and so she is "not [a good] candidate for implantation." (Tr. 1160).

In February, a provider at SpineCare Center reviewed Plaintiff's lumbar MRI from September 6, 2022, and ordered a TESI at T11-12 and a cervical X-ray. (Tr. 1346). Plaintiff received two cervical epidural injections in April 2023 (Tr. 1200, 1204, 1244, 1250), but when she

reported for the second injection, she told the provider that she did not get much relief after the first injection. (Tr. 1204, 1250). Before the first injection, Plaintiff complained of mid and lower back pain that radiated into her right hip and groin and down her right leg, as well as tingling, weakness, and muscle cramping in her right lower leg. (Tr. 1250). She said that she drags her right foot at times, complained of neck pain on the right side, and complained of numbness, tingling, and weakness in her right arm. (Tr. 1250). She received a thoracic epidural steroid injection on March 7, 2023. (Tr. 1298).

Plaintiff's medical issues also include the mental health conditions of depression, anxiety, and ADD. Medical records describe fluctuations in all of Plaintiff's conditions. Primary care provider notes from May 2018 through August 2019 indicate that she reported controlled anxiety (Tr. 728, 723, 717), well controlled depression (Tr. 723), and insomnia. (Tr. 717). The providers also observed that Plaintiff was alert and oriented, had normal mood and affect, and had good judgment. (Tr. 718, 720, 723, 726, 728). Plaintiff's primary care provider noted in January 2020 that Plaintiff complained of worsening anxiety. (Tr. 714). Notes from visits between January and April 2020 indicate that she was alert and oriented to time, person, and place (Tr. 459, 460-61, 464, 526-27, 710, 712, 714), and some notes describe that she was calm, well dressed, groomed. (Tr. 460-61).

On May 28, 2020, Plaintiff requested a higher dose of Xanax and Paxil from her primary care provider due to an increase in family stressors. (Tr. 707). The provider increased her dosage of Xanax. (Tr. 708). Provider notes from May through October 2020 indicate that at various times, Plaintiff was alert, oriented, and cooperative with normal mood and affect and intact concentration. (Tr. 373-74, 391, 456-57, 697, 700, 703, 705, 708). In October 2020, notes from Plaintiff's primary care provider indicate controlled anxiety while using Paxil and Xanax. (Tr. 697). Notes from two

visits in December 2020 indicate Plaintiff was alert and oriented and had normal mood and affect. (Tr. 691, 695).

On January 4, 2021, an MRI was performed on Plaintiff's brain with normal results. (Tr. 399). Notes from January through February 2021 indicate Plaintiff was alert and oriented, at times with intact concentration. (Tr. 412-13, 425-26, 612). On February 8, 2021, Plaintiff reported to Dr. Tumminello that she had been sleeping better up to two weeks prior but her insomnia started again and that she was stressed at home because of her children. (Tr. 423). Provider notes from May and July 2021 indicate Plaintiff was alert and oriented to time, place, and person, and at times indicated that she was pleasant and cooperative with intact concentration. (Tr. 454, 561-63, 567, 624-25). In July 2021, Plaintiff's primary care provider noted that her anxiety was stable. (Tr. 680).

On August 23, 2021, Plaintiff went for an initial psychological assessment for "bad anxiety, also [] worr[ied], especially about her son." (Tr. 796). Notes indicate she had undisturbed memory, logical thoughts, adequate insight, and orientation to person, place, and time. (Tr. 800). Notes from Plaintiff's primary care provider in March through September 2021 indicate that during her visit she was alert and oriented with normal mood and affect. (Tr. 676, 678, 680, 685). On September 7, 2021, Plaintiff reported "feeling a little better" (Tr. 802), but on September 20, 2021, Plaintiff reported that she had not been able to sleep for three days until she "finally crashed," her anxiety had been higher during the last week, and she was having increased panic attacks. (Tr. 804-05). Notes from these visits in September indicate euthymic mood, rational thought processes, orientation to person, situation, time, and place, good attention span, cooperative attitude, and grossly intact memory. (Tr. 802, 804). Notes from Dr. Tumminello the same day indicate Plaintiff was awake, alert, and oriented, and had intact concentration. (Tr. 639).

On October 26, 2021, Dr. Jack Carney performed a psychological consultative examination. (Tr. 657, 666). During the exam, Plaintiff reported that she washes dishes, sweeps, mops, vacuums, cleans the bathroom, and makes the bed. (Tr. 660). She reported knowing how to cook, do the laundry and drive, but stated that she no longer drives due to anxiety. (*Id.*). She also reported being able to count money and make change well enough to shop independently, but indicated she could not stay home unsupervised. (*Id.*). She reported trouble concentrating and stated that she easily gives up on tasks and completes them more slowly than most. (Tr. 661). Plaintiff ambulated well, described no obvious difficulties with fine motor skills, her eye contact was appropriate, and she was engaged. (Tr. 662). She offered information readily, her speech was easily understood, and her mood and affect were congruent and normal. (Tr. 662-63). She correctly completed simple math problems, could spell "world" backwards, and could recall three digits forward and two backward. (Tr. 663-64). She could remember general historical information and describe recent activities without difficulty. (Tr. 664). She had no delusions, hallucinations, confusion, or tangential thinking. (Tr. 665). She had adequate but limited judgment. (*Id.*). After examination, Dr. Carney opined that Plaintiff could understand, remember, and carryout instructions in a work setting and to respond appropriately to supervision, coworkers and work pressures in a work setting. (Tr. 666).

In October and November 2021 Plaintiff reported that her anxiety and sleep were much better. (Tr. 806-09). Notes from October indicate anxious mood, rational thought processes, orientation to person, situation, time, and place, good attention span, cooperative attitude, and grossly intact memory. (Tr. 650, 806). Notes from November were similar except they indicated an euthymic mood. (Tr. 808). Notes from Plaintiff's primary care provider in December 2021 report that Plaintiff was alert and oriented with normal mood and affect. (Tr. 674).

Notes from psych services from January through July 2022 indicate that Plaintiff reported waking up in the middle of the night (Tr. 810-11), up and down anxiety (*Id*.), and panic attacks that ranged in frequency from "a lot" (Tr. 820) to "less" (Tr. 822). The notes also describe a cooperative attitude, an anxious or euthymic mood, rational thought process, good attention span and concentration, good judgment, orientation to time, place, person, and situation, and grossly intact memory. (Tr. 810, 817, 819, 821, 823). In March 2022, Plaintiff's primary care provider noted that her anxiety was well controlled with Xanax. (Tr. 953). In May 2022, Plaintiff similarly reported improvement in anxiety, panic attacks, and sleep. (Tr. 821-22).

Mental health treatment notes from September 2022 through April 2023 indicate "significant pain and anxiety," difficulty with sleep, and panic attacks. (Tr. 1363-65, 1371). Plaintiff's provider diagnosed her with OCD on September 29, 2022, writing the note: "[e]verything in 3's." (Tr. 1363). Notes also indicate a cooperative attitude, an euthymic and anxious mood, rational thought process, good attention span, good judgment, normal thought content, grossly intact memory, and orientation to time, place, person, and situation. (Tr. 1363, 1366, 1372). Notes from primary care follow-up visits in September through December 2022 similarly indicate normal mood and affect. (Tr. 1127, 1130, 1134, 1138).

Another aspect of Plaintiff's medical issues is her post-viral syndrome. Plaintiff saw Dr. Tumminello on October 27, 2020, explaining that chronic fatigue and back pain make doing laundry and picking up her son difficult. (Tr. 389). Dr. Tumminello diagnosed Plaintiff with post viral syndrome due to mono. (*Id*.). Plaintiff also reported difficulty falling asleep. (*Id*.). Dr. Tumminello recommended a brain MRI, blood work, a nerve conduction velocity ("NCV") study, starting Elavil, weight loss, and exercise. (*Id.*).

The final category of Plaintiff's medical issues is her bilateral carpal tunnel syndrome. In December 2020, the NCV was performed, and the results showed mild to moderate bilateral carpal tunnel syndrome. (Tr. 400). On January 7, 2021, Plaintiff reported to Dr. Tumminello to follow up on the NCV and brain MRI. (Tr. 410). Dr. Tumminello diagnosed Plaintiff with bilateral carpal tunnel syndrome and fibromyalgia. (*Id.*).

At the May 4, 2023 hearing, the ALJ asked a vocational expert ("VE") to consider an individual with the same age, education level, and past work experience as Plaintiff with the following limitations: the hypothetical individual can perform only light work; never climb ladders, ropes, or scaffolds but occasionally may stoop, kneel, crouch, or crawl; frequently handle and finger bilaterally; occasionally be exposed to extreme cold and heat; never be exposed to workplace hazards such as moving mechanical parts in high exposed places; understand, remember, and carry out simple instructions; never perform work that requires a specific production rate such as assembly line work or work that requires hourly quotas; occasionally tolerate interaction with the public and with coworkers and supervisors; and occasionally deal with changes in the work setting. (Tr. 65). The VE testified that such a hypothetical individual would not be able to perform any of Plaintiff's past work. (Tr. 66).

The ALJ then asked the VE if there were some jobs in the national economy that a person with those limitations could perform. (*Id.*). The VE responded that such a hypothetical person could be a Retail Marker (alternate title Tagger), Laundry Sorter, Office Helper, and House Sitter. (*Id.*). The ALJ then asked the VE if the same jobs would be available for a hypothetical individual with the same limitations who would miss work four days out of a month or who would be off task twenty percent or more of a workday. (*Id.*). The VE testified that these additional limitations would eliminate competitive work. (*Id.*).

## II.     ALJ Decision

Disability under the Act is determined under a five-step test. 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). "Substantial gainful activity" is defined as activity that is both "substantial" and "gainful." *Id.* § 1572. "Substantial" work activity is work that involves doing significant physical or mental activities. *Id.* § 404.1572(a). "Gainful" work activity is work that is done for pay or profit. *Id.* § 404.1572(b). If the ALJ finds that the claimant engages in activity that meets both of these criteria, then the claimant cannot claim disability. *Id.* § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. *Id.* § 404.1520(a)(4)(ii). Absent such impairment, the claimant may not claim disability. *Id.* Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See id.* §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. *Id.* § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments. 20 C.F.R. § 404.1520(e). In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work. *Id.* § 404.1520(a)(4)(iv). If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled. *Id.* If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step. *Id.* § 404.1520(a)(4)(v). In the

last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education, and work experience. *Id.* § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience. *Id.* §§ 404.1520(g), 404.1560(c).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since May 3, 2019, and that she met the insured status requirements of the Act through March 31, 2023. (Tr. 19). Based on the medical evidence presented, the ALJ concluded that Plaintiff has the followings severe impairments: degenerative disc disease; degenerative joint disease (hips and right knee); fibromyalgia; depression; anxiety disorder; and attention deficit hyperactivity disorder (ADHD). (Tr. 19). Nevertheless, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20).

Next, the ALJ evaluated Plaintiff's testimony and found that Plaintiff's descriptions of the intensity, persistence, and limiting effects of her symptoms were inconsistent with the medical evidence and other evidence in the record. (Tr. 24). After consideration of the entire record, the ALJ determined that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with the following limitations: she can never climb ladders, ropes or scaffolds; occasionally stoop, kneel, crouch, or crawl; she can frequently handle and finger bilaterally; she can occasionally be exposed to extreme cold and heat; she can never be exposed to workplace hazards such as moving mechanical parts and high, exposed places; she can understand, remember, and carry out simple instructions; she can never perform work requiring a specific production rate (such as assembly line work) or work that requires hourly quotas; she can

occasionally tolerate interaction with the public and with her coworkers and supervisors; and she can occasionally deal with changes in the work setting. (Tr. 23).

Based on this RFC, the ALJ concluded that Plaintiff is unable to perform any past relevant work. (Tr. 32). However, the ALJ held, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform. (Tr. 33). Therefore, the ALJ determined that Plaintiff had not been under a disability, as defined in the Act, since May 3, 2019 through the date of the decision, and that she is therefore not entitled to a period of disability, DIB, or SSI. (Tr. 34).

## III.    Plaintiff's Argument for Remand

Plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the denial of review by the Appeals Council, reversed. (Doc. # 13 at 36). Plaintiff argues that the ALJ's determination is the product of legal error and is not supported by substantial evidence because the ALJ failed to properly evaluate her credibility under SSR 16-3p and Eleventh Circuit law. (*Id.* at 21-23). This argument has no merit.

## IV.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision

is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.    Discussion

After careful review, the court concludes that the ALJ's decision is supported by substantial evidence and that he applied the law correctly.

### A.    The ALJ properly evaluated Plaintiff's subjective complaints under SSR 16-3p and Eleventh Circuit law.

In the Eleventh Circuit, a claimant can establish a disability through personal testimony about pain or other symptoms. *Markukse v. Comm'r of Soc. Sec.*, 572 F. App'x 762, 766 (11th Cir. 2014). But, to do so, the claimant must show (1) evidence of an underlying medical condition, as well as (2) either (a) objective medical evidence confirming the severity of the alleged pain arising from that condition or (b) that the objectively determined medical condition is of such a severity that it can reasonably be expected to cause the alleged pain. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

If a claimant's subjective testimony is supported by medical evidence that satisfies the pain standard, it is sufficient to support a finding of disability. *Holt*, 921 F.2d at 1223. In other words,

if a claimant testifies that she has experienced disabling pain and satisfies the two-part pain standard, the ALJ must find a disability unless the ALJ discredits the claimant's testimony as not credible. *Crow v. Colvin*, 36 F. Supp. 3d 1255, 1259 (N.D. Ala. 2014); *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992). The Eleventh Circuit has made clear that when evaluating the extent to which a claimant's symptoms affect her capacity to perform basic work activities, the ALJ considers the following factors in relation to the other evidence in the record:

> the daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication taken to alleviate symptoms; treatment other than medication; any measures used to relieve symptoms; other factors concerning functional limitations and restrictions due to systems; and inconsistencies between the evidence and subjective statements.

*Esco v. Comm'r of Soc. Sec.*, 2024 WL 1156572, at *2 (11th Cir. Mar. 18, 2024) (citing § 404.1529(c)(3)-(4)).

A reviewing court will not disturb an ALJ's finding of credibility so long as it is supported by substantial evidence. *Raper v. Comm'r of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir. 2024). The ALJ is not required to discuss every piece of evidence during the credibility determination; however, the ALJ must provide enough evidence for the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole. *Id.*; *Esco*, 2024 WL 1156572 at *1 (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).

Plaintiff presents one argument as to why the court should reverse the ALJ's decision. She argues that in reaching a decision the ALJ failed to review the "entire case record" as required by SSR 16-3p. (Doc. # 13 at 21-22). Plaintiff argues that if the ALJ had properly done this, he would have concluded that her medical conditions were of a severity that they could reasonably be expected to give rise to her subjective symptoms, and therefore that her symptoms were credible. (*Id.* at 23 (citing *Holt v. Sullivan*, 921 F.2d 1221, 1222 (11th Cir. 1991))).

In making this argument, Plaintiff points to physical examinations conducted by both treating and examining providers, statements by providers regarding her pain and the failure of conservative treatment, MRIs, a nerve test, X-rays, and notes from mental health specialists and other providers regarding her mental health. (Doc. # 13 at 24-34). But, "[u]nder a substantial evidence standard of review, [Plaintiff] must do more than point to evidence in the record that supports her position; she must show the *absence* of substantial evidence supporting the ALJ's conclusion." *Sims v. Comm'r of Soc. Sec.*, 706 F. App'x 595, 604 (11th Cir. 2017) (emphasis added). Plaintiff has not done that.

The ALJ concluded that while Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, her statements about the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record. Indeed, the ALJ listed substantial medical evidence that supports his determination of a light work RFC and that demonstrates that he considered Plaintiff's medical condition as a whole.

Regarding Plaintiff's mental symptoms, the ALJ wrote that treatment notes show only occasional complaints of these impairments, as well as multiple occasions when Plaintiff reported that these impairments were controlled with medication or when Plaintiff made no complaint at all. (Tr. 25). He further noted that although Plaintiff reported panic attacks to her providers, there are no records to support her testimony that they occur daily, and her mental examinations frequently indicated that Plaintiff was cooperative, with an euthymic mood, good judgment, intact memory, good concentration, rational thought processes, and normal thought content. (Tr. 25-26). The record contains ample support for these findings. For example, treatment notes indicate that Plaintiff's providers wrote on several occasions that her anxiety was controlled with medication.

(Tr. 728, 723, 717, 697, 680, 953). One of Plaintiff's providers noted one occasion that her depression was controlled. (Tr. 723). Plaintiff's providers also frequently wrote that she had intact concentration and seemed awake, alert, and oriented to person, place, and time. (Tr. 391, 412, 425, 454, 456, 458, 460, 464, 526, 539, 563, 567, 612, 624, 639, 674, 676, 678, 680, 685, 688, 691, 695, 697, 700, 703, 705, 708, 710, 712, 714, 718, 720, 723, 726, 728). Plaintiff's mental examination notes indicate that she was cooperative, with undisturbed memory, logical thoughts, adequate insight, and orientation to person, place, and time, and euthymic mood. (Tr. 800, 802, 804, 806, 808, 810, 817, 819, 821, 823, 1363, 1366, 1372).

Regarding Plaintiff's physical symptoms, the ALJ highlighted that examination records repeatedly described as normal Plaintiff's gait, muscle strength, grip strength, sensation, and coordination. (Tr. 25). Further, the ALJ pointed out that imaging records indicated that Plaintiff had mild to moderate findings, and no findings severe enough to warrant surgery. (Tr. 25). The record also contains ample support for these findings. Provider notes indicate Plaintiff almost always had a normal gait (Tr. 309, 391, 413, 426, 454, 457, 459, 461, 464, 527, 612, 625, 639, 817, 821, 823, 1024, 1366, 1372), and frequently had 5/5 motor results in upper and lower extremities (Tr. 391, 413, 425, 612, 625), 5/5 motor strength for various hip and knee movements (Tr. 374), 5/5 strength testing in extremities and other major muscle groups (Tr. 561, 650, 1084), intact coordination (Tr. 391, 413, 426, 612, 639), and normal sensation. (Tr. 374, 391, 413, 425-26, 539, 612, 625, 639, 1024). The Social Security Disability Consultative Examination indicated 5/5 left and right grip strength. (Tr. 650, 653). MRI and X-ray imaging showed mild to moderate conditions, but not severe conditions. (Tr. 318-19, 367, 1012-13, 1015-16, 1018-19, 1124, 1043-44, 1045-48, 1084). And, as the ALJ referenced, a provider told Plaintiff that he did not recommend surgery considering her condition and MRI results. (Tr. 1069, 1124).

Plaintiff's own testimony supports a finding that she can perform light work. At the hearing, Plaintiff admitted to being able to drive, cook a simple meal (such as a sandwich or Hamburger Helper), feed herself, go to the store, eat out, fold three or four towels at a time, brush her teeth, and keep her three-bedroom house clean with the assistance of her son and husband. (Tr. 57-59). She also admitted that "[s]ome days [she] can" dress herself without assistance, although "[m]ost days [she] can't." (Tr. 57). Plaintiff said she could lift two to three pounds without pain (Tr. 54), and that she normally gets around 3,000 to 4,000 steps per day as recorded by the Fitbit that she wears. (Tr. 61). In her function report, Plaintiff stated that she usually has no problem paying attention, following written or spoken instructions, and getting along with authority figures. (Tr. 286).

As the ALJ discussed (Tr. 27), during her psychological consultative exam, Plaintiff reported that she washes dishes, sweeps, mops, vacuums, cleans the bathroom, and makes the bed. (Tr. 660). She reported knowing how to cook, do the laundry, and drive, but stated that she no longer drives due to anxiety. (*Id.*). She also reported being able to count money, make change well enough to shop independently, but indicated she could not stay home unsupervised. (*Id.*). She reported trouble concentrating, stating that she easily gives up on tasks and completes them more slowly than most. (Tr. 661). The court notes that this is in contrast with numerous provider notes that described Plaintiff's concentration as "good." (Tr. 819, 823, 1024). During the exam, Plaintiff ambulated well, described no obvious difficulties with fine motor skills, her eye contact was appropriate, and she was engaged. (Tr. 662). She offered information readily, her speech was easily understood, and her mood and affect were congruent and normal. (Tr. 662-63). She correctly completed simple math problems, could spell "world" backwards, and could recall three digits forward and two backward. (Tr. 663-64). She could remember general historical information and

describe recent activities without difficulty. (Tr. 664). She had no delusions, hallucinations, confusion, or tangential thinking. (Tr. 665). She had adequate but limited judgment. (*Id*.). After examination, Dr. Carney opined that Plaintiff could understand, remember and carryout instructions in a work setting and to respond appropriately to supervision, coworkers and work pressures in a work setting. (Tr. 666). All of this supports a finding that Plaintiff can perform light work.

At this stage of review, the relevant inquiry is not whether some evidence might support a finding of greater limitations than those provided in the RFC; rather, the question is whether substantial evidence supports the ALJ's decision. Additionally, although SSR 16-3p requires the ALJ to have considered Plaintiff's condition as a whole, the ALJ was not required to discuss every piece of evidence during the credibility determination. *Raper*, 89 F.4th at 1277; *Esco*, 2024 WL 1156572 at *1 (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). Undoubtedly, Plaintiff suffers from a number of ailments that affect her daily activities. However, each of these limitations are reflected in the ALJ's findings and his determination of Plaintiff's RFC. The ALJ's findings are supported by substantial evidence.

**VI.    Conclusion**

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and the proper legal standards were applied in reaching this determination. The Commissioner's final decision is therefore due to be affirmed. A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this February 25, 2025.

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE